155-07/MEU
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
Sea Consortium Pte. Ltd.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SEA CONSORTIUM PTE. LTD.,

                Plaintiff,

  -against-

HRC SHIPPING LTD.
                Defendant.
------------------------------------------------------------x

**07 CV 9443 (PAC)**

**DECLARATION OF SIMON STEWART DAVIDSON**

SIMON STEWART DAVIDSON, pursuant to 28 U.S.C. §1746 hereby declares and says the following under penalty of perjury:

1.     I am a solicitor of the Supreme Court of England and Wales and have been a partner with the law firm of Holman Fenwick & Willan since 1994. I am currently based in that firm's office in Singapore. I make this declaration on behalf of Plaintiff SEA CONSORTIUM PTE. LTD. ("SEA CON") in support of SEA CON's application for attorneys' fees and disbursements incurred in enforcing the arbitral awards rendered in favor of SEA CON and against Defendant HRC SHIPPING LTD. ("HRC-Bangladesh"), who has in bad faith refused to pay any amount against the awards and has instead raised frivolous objections and has taken other wrongful actions in an effort to avoid its responsibility to pay on these awards. In particular, this declaration is submitted

to establish the attorneys' fees and disbursements paid by SEA CON to Holman Fenwick & Willan in connection with enforcing the arbitral awards rendered against HRC-Bangladesh.

2. Holman Fenwick & Willan were retained to act as legal counsel for SEA CON in connection with the disputes between SEA CON and HRC-Bangladesh, and I am the attorney in charge and responsible for all aspects of this matter worldwide at Holman Fenwick & Willan. I make this declaration based upon my own personal knowledge.

3. Insofar as the contents of this declaration are within my own knowledge, they are true. Insofar as the contents of this declaration are not within my own direct knowledge, they are true to the best of my information and belief.

### HRC-BANGLADESH'S WRONGFUL ACTIONS

4. Before setting forth the invoices, I believe it important to place before the Court the full scope of the proceedings between these parties. While I appreciate that this information has been set forth before the Court previously, I believe it might be helpful if all of the information was placed before the Court in a single Declaration so that the Court need not chase the thread through SEA CON's various prior submissions. A review of this scope should also help the Court appreciate the full extent of HRC-Bangladesh's wrongful actions and the need to expend considerable sums in order to compel HRC-Bangladesh to pay on the arbitral awards rendered against it.

**A.    The Charter Agreement Governed the Relationship Between the Parties**

5. In February 2004, the parties entered into a slot-charter agreement whereby both would provide vessels on a joint feeder service between Colombo, Sri Lanka and Chittagong, Bangladesh, carrying cargoes for each other.

6. One of the carrying vessels used was the M/V JAAMI, which due to a tsunami, became a total loss along with her cargo, which included some 53 containers carried for HRC-Bangladesh.

7. The tsunami was unpredicted and HRC-Bangladesh's loss, while tragic, plainly was not the responsibility of SEA CON. HRC-Bangladesh should have recovered from its own insurer and this matter should never have been disputed between the parties.

8. To the extent that HRC-Bangladesh felt that despite the unpredicted nature of the damage, it needed to attempt to recover from SEA CON nonetheless, the charter contained a law and jurisdiction clause that required the parties to arbitrate all disputes in London, England pursuant to English law. English arbitration was the one and only available venue for resolution of disputes between the parties. Both sides were aware of the arbitration clause and entered into the arbitration agreement in the charter freely before any problems between the parties had arisen.

B. **HRC-Bangladesh's First Wrongful Act Was to Commence Proceedings in an Improper Forum and Vexatiously Arrest a Non-Party's Vessels**

9. In wanton and knowing breach of the arbitration agreement, though, on 18 December 2005 HRC-Bangladesh wrongfully commenced proceedings in the High Court of Bangladesh.

10. Exacerbating this breach, HRC-Bangladesh knowingly and entirely wrongfully commenced the Bangladeshi action against (among others) two vessels, the M/V X-PRESS RESOLVE and the M/V X-PRESS MANASLU, which HRC-Bangladesh knew were time-chartered by SEA CON.

11. Whilst I doubt that HRC-Bangladesh could have believed at the time it had a claim against SEA CON for the loss of its containers due to the tsunami, the arrest

action was entirely unjustifiable because it is black letter law in England, Bangladesh and every other jurisdiction with which I am familiar that there is no basis for arresting vessels time chartered by the defendant.

12.     In this case, HRC-Bangladesh certainly knew in advance that these two vessels were time-chartered by SEA CON and were not owned by SEA CON. HRC-Bangladesh expressly referred to the time charters in the arrest action and HRC-Bangladesh admittedly and deliberately made no attempt to establish who the beneficial or registered owners were. Even to the extent that HRC-Bangladesh was unaware of the fact that SEA CON were merely time charterers, however, the information was (a) readily ascertainable by reference to maritime publications and (b) advised of the fact immediately after the arrest and was asked to voluntarily lift the wrongful arrests and withdraw the claim against these vessels, which HRC-Bangladesh refused to do.

13.     As no claim could properly be made against either vessel under any applicable law (including but not limited to the law of England and the law of Bangladesh), the arrests were knowingly made in bad faith and without any regard as to whether there were adequate grounds for the arrest of the vessels.

14.     Despite diligent efforts by SEA CON[1] and the owners of the vessels to have the arrests lifted, this was not accomplished until 20 April 2006 (*i.e.*, approximately 4 months later) by reason of various appeals and stay orders obtained by HRC-Bangladesh. HRC-Bangladesh's appeals and stay orders were obtained for the obvious purpose of keeping commercial pressure on SEA CON and HRC-Bangladesh knowingly submitted its applications for such appeals and stay orders improperly and in bad faith for

---

[1] Although SEA CON was not the owner of either of the vessels, it was a time charterer of both, and the arrest of the two ships resulted in delays to cargo for which SEA CON was responsible, and caused commercial friction between SEA CON and the vessel owners.

the purpose of delay and harassment and without any basis in law or in fact. Even after the admiralty judge in Bangladesh had dismissed all of its claims on the obvious grounds that no one could be held liable for an Act of God which the tsunami undoubtedly was, and also dismissed all of HRC-Bangladesh's spurious arguments as to why it should be allowed to arrest time-chartered vessels holding that it was clear beyond doubt there could be no admiralty jurisdiction for such arrests, HRC-Bangladesh persisted in staying the release order by appealing the decision. HRC-Bangladesh knowingly filed the appeal frivolously and vexatiously in order to keep SEA CON from operating their container feeder service in Bangladesh for several more months and inflict further loss and damage upon SEA CON by keeping the time chartered vessels under arrest. HRC-Bangladesh had no valid legal ground to appeal as eventually decided by the Court of Appeal which, after HRC-Bangladesh could no longer delay the inevitable, summarily dismissed the application for leave to appeal as unfounded and unwarranted.

15.  On the day of the arrest of these vessels (22 December 2005), SEA CON called upon HRC-Bangladesh to concur in the appointment of an arbitrator in London in accordance with the arbitration clause of the charter party.

16.  HRC-Bangladesh wrongfully contended that it was not bound by the arbitration clause and willfully pursued the Bangladeshi proceedings in knowing and purposeful breach of the arbitration agreement.

17.  HRC-Bangladesh did not accept that it was bound by the arbitration agreement and obliged to concur in the appointment of an arbitrator until 2 May 2006 (*i.e.*, only after its improper arrest action in Bangladesh was concluded against it).

18. In the intervening four-plus month period, SEA CON commenced proceedings in the English High Court in London, seeking an order compelling HRC-Bangladesh to arbitrate and seeking a Court Order for the appointment of an arbitrator in view of HRC-Bangladesh's refusal to concur in the appointment of a sole arbitrator or to name its own when lawfully called upon and obliged to do so.

19. SEA CON's application in this regard was granted and an order awarding SEA CON costs of £3,500 in respect of those proceedings was made on 7 July 2006, which HRC-Bangladesh – flaunting the English Court Order – has refused or otherwise failed to pay.

C. **Not Only Did HRC-Bangladesh Lose Its Own Improper Suit in Bangladesh, It Also Lost the Arbitration Which it Has, In Bad Faith, Refused to Pay**

20. Pursuant to an arbitration award dated 26 March 2007, SEA CON was awarded damages against HRC-Bangladesh in the principal sum of $2,886,076.87 as a result of HRC-Bangladesh's breach of the London arbitration agreement, wrongful arrests of the vessels in Bangladesh, breach of the claim handling provisions contained in the charter, breach of implied terms in the charter, and wrongful interference with SEA CON's contractual rights.

21. The award directed HRC-Bangladesh to pay the award "forthwith", but despite due demand, and in bad faith, HRC-Bangladesh has refused or otherwise failed to make any payment whatever against the award.

22. Instead, HRC-Bangladesh filed a baseless and futile action in the English High Court seeking (a) to challenge the award on the basis that the arbitrator lacked jurisdiction to award damages for certain claims and (b) permission to appeal on a point of law in order to seek to set aside certain damages awarded.

23. The action was futile to the point of frivolity because even if the jurisdictional issue was decided in favor of HRC-Bangladesh, the same damages would have been awarded on other grounds found by the arbitral tribunal. Hence, even if HRC-Bangladesh would have succeeded on all the points it raised, HRC-Bangladesh would still have been liable to SEA CON for unchallenged and indisputable sums.

24. Accordingly, the failure to make any payment at all against the award – even for the portion of the award unaffected by HRC-Bangladesh's action in the English High Court (which, at approximately $443,000 was not insignificant) – was in clear bad faith.

25. In any event, though, the English High Court thereafter ruled against HRC-Bangladesh on all counts.

26. The effect of the English High Court ruling was that it made the arbitration award final and enforceable and HRC-Bangladesh was obligated to pay against the award.

27. Even after such ruling, though, in continued bad faith and flaunting now a second Court Order, HRC-Bangladesh still refused to pay the award, despite due demand.

28. Under English law, a prevailing party is entitled to certain costs and interest against the unsuccessful side. Ordinarily in arbitration, the parties attempt to negotiate such an award before it is issued. Here, SEA CON invited HRC-Bangladesh to negotiate and settle the costs and interest to avoid the further costs in obtaining a second award from the arbitrators on this point.

29. HRC-Bangladesh refused or otherwise failed to negotiate in good faith, however, and ultimately the matter was put to the arbitrators, who issued a costs and

interest award. That second award was final and enforceable when rendered, but HRC-Bangladesh, in bad faith, has refused to pay on this award as well.

D.    **SEA CON Properly Initiated Collection Actions**

30.    As a result of HRC-Bangladesh's bad faith refusal to pay on the award, SEA CON commenced actions in various jurisdictions for the purpose of securing funds to pay on the award.

31.    SEA CON commenced an attachment action in this Court, and commenced similar actions in France and Singapore. SEA CON has restrained HRC-Bangladesh assets in all three of those jurisdictions, and in each jurisdiction, HRC-Bangladesh raised spurious objections to the restraint of its funds.

32.    Here, for example, HRC-Bangladesh filed a motion to vacate the attachment even though there were no grounds for vacature (HRC-Bangladesh withdrew the motion at the eleventh hour).

33.    HRC-Bangladesh's application made in France to vacate the French conservatory attachment was similarly meritless and HRC-Bangladesh withdrew its application in that action shortly before it was to be rejected by the French court. It had intentionally been filed not in the proper court for challenging a conservatory attachment order, to avoid its instant dismissal as the grounds on which it had been advanced was devoid of any merit, which the proper court would not have allowed to proceed. As in all proceedings, HRC deliberately failed to give its lawyers instructions leading to repeated adjournments and delays, all with the obvious intent to maintain its spurious challenge to prevent collection on the awards and force SEA CON to incur additional costs.

34. In Singapore, HRC-Bangladesh attempted in bad faith to raise the same challenge to the award as had been raised and rejected by the English High Court, and this attempt was rejected by the Singaporean Court. Not only was this obviously res judicata because the same – bad – point had already been heard and determined by the competent tribunal and on appeal by the English court but this was clearly also not one of the grounds on which enforcement of a foreign arbitration award may be challenged under the New York Convention for the Recognition and Enforcement of Foreign Arbitral Awards, which applies in Singapore as in most jurisdictions. This was yet another blatant attempt in bad faith to delay the inevitable and force SEA CON to incur additional costs to recover the sums awarded.

35. HRC-Bangladesh also groundlessly sought to reserve the right to challenge the personal service of the Singaporean court order effected upon HRC-Bangladesh and has gone so far as to obstruct service of the Singaporean court papers by returning letters delivered by courier to the courier company. HRC-Bangladesh is also seeking to dodge service in the Singapore action by refusing to accept registered mail and by seeking to prevent clerks in Bangladesh from leaving copies of the Singaporean court papers at HRC-Bangladesh's business premises. HRC-Bangladesh even went so far as to deny instructions to the Singaporean lawyers it had appointed to act for it to accept service of court papers, thus causing further delay and costs to be incurred by insisting upon personal service upon it in Bangladesh, which it then went on to refuse as set out, by denying or returning couriered and registered airmail letters and seeking to prevent clerks from leaving the Singaporean court papers at its Bangladeshi premises. In all my years of experience I have not come across such blatant acts of defying arbitration awards

and court orders, which whilst ultimately futile caused unprecedented delays and substantial cost and expense to be incurred in the collection on the awards, which I can only conclude was the malicious intention of HRC-Bangladesh.

36. The Singapore High Court has now ruled against HRC-Bangladesh on all of its applications in respect of enforcement of the arbitration awards.

37. HRC-Bangladesh's various applications in New York, France and Singapore were not borne out of any good faith basis for challenging the arbitral award or the proceedings in those fora, but were instead nothing more than a vexatious and harassing attempt to drive up the cost of compelling it to pay on a legitimate and unchallengeable arbitral award, a large part of such award being compensation for HRC-Bangladesh's own prior bad acts.

38. In any event, in Singapore and in this Court, the award has been entered as a judgment. Judgment remains pending in France and is anticipated shortly. Despite entry of judgment against it in these two jurisdictions, though, and in continued bad faith, HRC-Bangladesh has still refused to make any payment whatever to SEA CON, essentially requiring SEA CON to expend still further funds in order to collect.

E. **Seizure and Sale of the M/V BANGA BORAT**

39. HRC-Bangladesh's vessel, the M/V BANGA BORAT was later seized when it entered Singapore under a writ of seizure and sale.[2]

40. Although HRC-Bangladesh could have offered cash security in lieu of its vessel remaining seized by the Singapore Court to enforce the judgments against it, HRC-Bangladesh refused to provide alternative security or to pay the sums adjudged against it.

---

[2] Which is akin to an enforcement action and is not an admiralty arrest.

NYDOCS1/301760.1                    10

41. The predictable result of such inaction was still more delay occasioned not only by the need to sell the vessel, but also by the appearance of other creditors staking claims to the proceeds of the sale of the M/V BANGA BORAT.

F. **HRC-Bangladesh Engaged In Another Vexatious Arrest in Bangladesh**

42. Despite that every ruling has been against it, HRC-Bangladesh nonetheless commenced another proceeding in Bangladesh in July 2007 against two vessels, the M/V DA LI and the M/V LADY FATIMA. HRC-Bangladesh asserted the same claims previously made against SEA CON (which had already been dismissed as wholly unfounded by the Bangladesh Court) as when it had arrested the M/V X-PRESS RESOLVE and M/V X-PRESS MANASLU.

43. As was the case previously, the M/V DA LI and the M/V LADY FATIMA were time chartered by SEA CON and owned by other companies. Again as was the case previously, HRC-Bangladesh was aware of this fact at the time it sought the arrest, and to the extent it did not actually know this, (a) HRC-Bangladesh could have learned this from maritime publications and (b) HRC-Bangladesh in any event was immediately informed of the ownership of the vessels and the fact that SEA CON was merely a time charterer but proceeded nonetheless.

44. Notwithstanding the fact that the earlier arrests had been struck out for lack of both a cause of action and admiralty jurisdiction for an arrest, HRC-Bangladesh abusively, vexatiously, wantonly, and in complete and utter bad faith proceeded nonetheless with the new arrest action in order to harass SEA CON and for no legitimate purpose.

G.   **HRC-Bangladesh Loses the Second Arrest Action**

45.   The vessels' owners, along with SEA CON, applied to the High Court of Bangladesh to set aside the new arrests.

46.   Since the earlier decisions of the Bangladesh High Court are binding on HRC-Bangladesh, and since the decision to set aside the original arrest had been upheld on appeal,[3] it was inevitable that the new arrest would also be set aside, and it was, on 14 August 2007.

H.   **HRC-Bangladesh Loses the Arbitration Based on the Second Arrest**

47.   SEA CON has now obtained a further arbitral award against HRC-Bangladesh (which HRC-Bangladesh also refuses to pay) for the loss and damage inflicted by the second arrest action in Bangladesh (which, again, was not just a wrongful arrest but an improper proceeding given the exclusive forum selection clause in the contract between SEA CON and HRC-Bangladesh) against the M/V DA LI and M/V LADY FATIMA.

48.   HRC-Bangladesh refused to participate in the further arbitration proceedings but in view of the first arbitral award the tribunal had no hesitation in finding that HRC-Bangladesh could not have raised a credible defense and held them in breach of the arbitration agreement. Given the prior experience, the tribunal further found that HRC-Bangladesh could have been under no illusion that, as a matter of Bangladeshi law, such arrests were improper and manifestly illegitimate.

---

[3] The Bangladesh High Court set aside the original arrest because admiralty jurisdiction does not exist to arrest vessels that are not owned by, but are only time-chartered by, the defendant. This decision was upheld on appeal. The Bangladesh High Court, in a further binding decision, also struck out HRC-Bangladesh's action because neither HRC Bangladesh nor any cargo interest could have a claim for loss or damage to cargo suffered in the grounding of the M/V JAAMI at Colombo because the event was due to a tsunami which the Court found was plainly and indisputably an Act of God for which no one could be held liable.

I.   **Summary**

49.   HRC-Bangladesh has gone to extreme lengths to harass and delay and to attempt to avoid its obligation to pay legitimate arbitral awards and judgments entered against it. It should be noted that a large part of the first award is for damages suffered by SEA CON due to HRC-Bangladesh's prior wrongful actions. In my over 20 years of practice, I have never experienced such inappropriate and abusive conduct.

50.   While I appreciate that under U.S. law attorneys fees are not awarded as a matter of course, I am informed that in the event of particularly vexatious conduct by one side, the Court is at liberty to award such fees. Based upon the foregoing, HRC-Bangladesh's actions appear to be the paradigmatic example of such a case in which one side's actions were so wholly wanton, exceptionally vexatious and so utterly lacking in good faith but that the Court should not hesitate to award fees. Indeed, in my opinion, a failure to award reasonable attorneys fees would send a message that the Court will tolerate such action without any penalty at all.

51.   As a further consideration, I note that the parties – before any conflict arose between them – agreed to the application of English law to any dispute between them. Under English law, the costs of enforcing an arbitral award, which includes reasonable attorneys fees and disbursements, are always recovered as a matter of course in the enforcement proceedings. In the usual way, court costs and attorneys' fees reasonably incurred to enforce an award are deducted from any recoveries made before distribution to judgment creditors. Accordingly, it is respectfully submitted that this Court in rendering a decision on this application should consider application of English law instead of (or in conjunction with) U.S. law.

### EFFECT OF THE SINGAPORE COURT ORDER RELATING TO
### THE SALE OF M/V BANGA BORAT

52.  I am advised that HRC-Bangladesh has taken the position before this Court that (whether under Singapore law or pursuant to some other reason) the sale proceeds of the M/V BANGA BORAT which were paid over to SEA CON should be used first to satisfy SEA CON's awards against HRC-Bangladesh in date order.

53.  To the contrary, however, we were very careful not to have the court determine any priority for the various claims of SEA CON against HRC-Bangladesh under the three awards and the costs orders. This is perfectly clear from the summons for the hearing of our application for payment out of the M/V BANGA BORAT sale proceeds, a copy of which is annexed hereto as Exhibit A.

54.  The Court in Singapore was asked to determine priority for, first, the sheriff's expenses, second for any judgment on the mortgagee bank's claim, and third, together for all claims by SEA CON against HRC-Bangladesh under the four Singaporean judgments/orders for payment on the three awards and the two English court costs orders. *See* paragraph 4 (b) with paragraph 2 (c) of the summons, Exhibit A hereto.

55.  Under English and Singaporean law, SEA CON is at liberty to appropriate the recovery from the payment out to full or partial satisfaction as it sees fit. SEA CON have consistently appropriated first to costs, then to interest, last to damages, and kept HRC-Bangladesh, through their lawyers, fully advised. *See, e.g.,* Rajah & Tann's letter of 13 February 2008, Exhibit B hereto.

56.  There is no rule of English or Singaporean law and no good reason why the recovery should have to be appropriated in full satisfaction to the first award, just because it was first in time.

57. Insofar as the current state of the accounting is concerned with respect to amounts owed by HRC-Bangladesh to SEA CON under the various awards and judgments, and the amounts collected, these are set forth in a table which I attach as Exhibit C hereto. In sum, this table shows that SEA CON was owed a total of $ 4,943,413.70 by HRC-Bangladesh, of which $ 4,124,720.53 has been paid, leaving an outstanding balance of $ 818,693.17. Of this amount, SEA CON has secured $ 459,280.26 in the Rule B proceedings here in New York and $ 157,611.90 in the conservatory attachment proceedings in France. The sum of $ 201,801.01 is both unpaid and unsecured in any current proceeding. These amounts do not include the attorneys fees award requested by way of the instant application.

## INVOICES OF HOLMAN FENWICK & WILLAN

58. I confirm that we have delivered the invoices set out in Exhibit D hereto to SEA CON and that SEA CON has paid them. All of our invoices to SEA CON have been paid within about a month of presentation. Exhibit D hereto also sets out the fees and disbursements incurred on enforcement during the months of April 2007 to January 2008 by reference to our monthly invoices and showing the deductions made for time costs and disbursements incurred for other purposes. The invoices with their narratives are also attached hereto as a part of Exhibit D.

59. I confirm that the total legal fees and disbursements we invoiced that concern enforcement of the arbitral awards amount to S$ 311,566.13 (equivalent to US$ 218,934.81 at a rate of US$ 1 = S$ 1.4231 being the latest exchange rate published by the Monetary Authority of Singapore on 1 February 2008 when the schedule in Exhibit E was prepared). This amount excludes legal fees and disbursements incurred for

other purposes, in particular those incurred in obtaining the awards, defeating the appeal against the first award and costs awarded to SEA CON by the arbitral tribunal's first, second and third partial awards of 26 March, 24 May, and 16 November 2007.

60.     Of the $ 218,934.81 claimed in fees paid to Holman Fenwick & Willan, $ 15,751.37 relates to the proceedings in France and $ 203,183.44 relates to the proceedings in Singapore. The fees claimed with respect to the proceedings in New York are the subject of Mr. Unger's Declaration, and amount to approximately $ 59,000, which amount is requested in addition to the $ 218,934.81 documented by this Declaration.

**FURTHER ARBITRATION AGAINST HRC-BANGLADESH WOULD BE IMPROPER AND POINTLESS**

61.     I also understand that HRC-Bangladesh has submitted to this Court the notion that this is an improper venue for this application for an award of attorneys fees. Instead, I understand, HRC-Bangladesh has submitted that the application should be made to the London arbitral tribunal. Once again, HRC-Bangladesh is entirely incorrect and I submit that this meritless position is taken by HRC-Bangladesh, just as with all of its other improper arguments, for the sole purpose of delay and harassment.

62.     As a matter of English law, the arbitral tribunal does not have authority to issue awards of attorneys fees incurred in relation to actions to enforce the tribunal's arbitral awards. Such jurisdiction is reserved to the courts where enforcement is sought. It is nonsense to suggest the arbitrator should be asked to determine recovery of enforcement costs. Any dispute over the costs of enforcing an award does not arise from the contract between the parties, and the parties did not agree to refer it to arbitration. The arbitration agreement does not encompass claims for recovery of such enforcement costs but only the costs of obtaining an award. The arbitration agreement does not and could

not go beyond the stage of the award, when the claim, which is subject to arbitration, is replaced by the award, which is not subject but the result of arbitration. If costs are incurred in court proceedings for the enforcement of an award, it is then for the courts to decide whether such costs are recoverable in the enforcement proceedings.

63.    Accordingly, this application for attorneys fees properly cannot and should not be submitted to the arbitral tribunal in London. Moreover, given HRC-Bangladesh's past conduct, there is no reason to believe that by submitting the application to the arbitral tribunal in London that HRC-Bangladesh would (a) participate, or (b) pay on an eventual award, whether or not it participated. Therefore, proceeding before the London arbitral tribunal would be pointless.

64.    This is not to say that the application could not be made to other courts, such as the English Court, the Singaporean Court, or the French Court.

65.    Proceeding before the English Court or the Singaporean Court would require a new action, though, with attendant costs that would be unnecessary. Moreover, there is a question as to the effectiveness of such an action before those Courts, because no property of HRC-Bangladesh is presently restrained in either of those jurisdictions.

66.    Accordingly, this Court, which (a) has both subject matter and personal jurisdiction, (b) has authority to issue the relief requested, and (c) has jurisdiction over funds in which Defendant HRC-Bangladesh has an interest, is a proper and appropriate venue for this application.

67.    To remove all doubt, the timing of the application is also appropriate. This application comes toward the conclusion of the proceedings here: judgment has been entered against HRC-Bangladesh with respect to one of the arbitral awards, and

judgment under the other awards remains pending, though there seems no reason (short of an application) why judgment would not be entered.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: Singapore
3 April 2008

By: _____
SIMON STEWART DAVIDSON